[Civ. No. 18423.   First Dist., Div. One.   Nov. 6, 1959.]

JEANNE MARIE GOBAR, Appellant, v. ROBERT W. GOBAR, Respondent.

*Assigned by Chairman of Judicial Council.

Marvin G. Giometti and Arguello, Giometti & McCarthy for Appellant.

Wroy F. Renaghan and Betts & Renaghan for Respondent.

WAGLER, J. pro tem.*—This is an appeal from an order modifying a custody decree by transferring custody of a 3-year-old male child from his mother to his father. The mother secured a default interlocutory decree of divorce on September 14, 1956, which, in harmony with a property settlement agreement, awarded her custody of said child, subject to reasonable visitation by the father, $75 per month for his support, and $1.00 per year alimony.

On June 17, 1957, defendant father applied to the court for modification of this decree by requesting that custody

*Assigned by Chairman of Judicial Council.

be transferred to him. In his supporting affidavit defendant alleged: that the conditions had changed since the entry of the interlocutory decree in that at that time plaintiff had agreed to personally look after said child except when at work; that instead she had placed him in a crowded unlicensed home and had refused to tell defendant his whereabouts until December 1956; that said child had been ill on several occasions and plaintiff had not provided proper medical care; that said child had had his tonsils removed and plaintiff had made no arrangements for his care upon release from the hospital; that defendant had cared for him for 10 days on this occasion during which time he was unable to contact plaintiff; that plaintiff seldom visited said child and that defendant had been informed that the child was in need of special medical care and more affection.

The record before us contains no counteraffidavit. We will therefore assume that none was filed. A hearing was held on June 24, 1957, after which the court ordered an investigation by the probation department and the matter was continued pending such report.

On March 18, 1958, the motion came on for further hearing before a different judge. The probation report was received in evidence pursuant to stipulation. It disclosed that plaintiff was 31 years old and steadily employed in San Francisco as a switchboard operator, that she had a child (a girl) by her first marriage who was in custody of her father in Illinois. Plaintiff's references thought well of her and reported that the child in question was well cared for. The report disclosed in turn that defendant was 44 years old and was employed as a building inspector; that he had four children by previous marriages. Two of these had been adopted with defendant's consent by their stepfather. A third he did not support and the fourth, according to the child's mother, he did support and visit regularly. This former spouse expressed the opinion that he would be able to provide a good home for the child in question and she hoped he had "settled down." The probation officer recommended that in view of the absence of allegations of unfitness or immorality on the part of the mother, she should retain custody because of the child's "tender years."

Between the date of the first and second hearing a final decree was entered, and each of the parties had remarried, plaintiff contracting her third and defendant his seventh marriage.

After both parties had testified at length an order was made awarding custody "to the defendant, subject to reasonable rights of visitation of the plaintiff; provided, however, that said right of reasonable visitation shall not include the right to remove said minor child from the home of the defendant. . . ."

The appeal comes before us upon a partial clerk's transcript which contains defendant's affidavit and upon a transcript of the testimony taken at the last hearing.

It is plaintiff's sole contention that the record before us shows an abuse of discretion on the part of the trial court in modifying the custody order.

In her brief, appellant has for the purposes of her argument established two different periods of time, each of approximately nine months' duration. The first period commences with September 14, 1956 (the date of the interlocutory decree), and ends June 17, 1957. The second period runs from June 17, 1957, to March 18, 1958, the date of the last hearing. Respondent does not object to such division of time but points to the significant fact that the division date coincides with the date upon which he took steps to modify the custody order and that it was only then that the child was taken to the mother's residence in San Francisco. This fact was pointed out to the trial judge who was entitled to and apparently did, as will hereinafter appear, infer that the institution and pendency of the modification proceedings had some bearing upon plaintiff's interest in the child thereafter.

The record before us discloses that within two weeks after the interlocutory decree plaintiff went to reside with friends in Sharp Park. A few days later she obtained employment in San Francisco. Upon leaving Contra Costa County she placed the child in the unlicensed home of a Mr. and Mrs. Shaw in Concord. Here he resided in a three-bedroom home with the Shaws and their four children, all under 8 years of age, until the institution of the modification proceedings. Plaintiff justified her failure to take the child to live with her at an earlier date on the ground that she was financially unable to do so. She admitted, however, that she had regularly received $75 per month child support from defendant and had been steadily employed since October 1956; had received the equity in the family home in Concord under the property settlement agreement; had sold same to defendant for $1,000; and had received one-half of this sum before moving to Sharp Park. She had also received the family auto-

mobile upon which defendant made the payments, and while at Sharp Park had been charged nothing for board and room although she did occasionally buy groceries.

In his testimony defendant enlarged upon the facts set forth in his affidavit. He testified further that plaintiff had refused to tell him where the child was until December 1956, and then only after his refusal upon advice of counsel to give plaintiff the December check for support. (This fact plaintiff conceded.) Defendant visited the child frequently in Concord and found him "in need of medical attention on several occasions." On his first visit in December the child's "eyes were full and he had such a cold he could hardly breathe." Defendant personally took the child to a doctor a "half dozen times" between December 1956 and July 1957.

Medical records attached to the probation report disclosed that the child had suffered periodically from an upper respiratory infection both before the interlocutory decree and during the nine months immediately thereafter. During this nine-month period, although plaintiff had left her Blue Cross card with the Shaws with instructions to take the child to a doctor when necessary, they had taken him to a doctor but once. Plaintiff had taken him to the hospital for the removal of his tonsils, but on this occasion defendant had taken him home from the hospital and cared for him for a period of 10 to 12 days thereafter.

After the initiation of the modification proceedings plaintiff moved the child to San Francisco. Here he was living at the time of the final hearing in a three-bedroom flat with plaintiff, plaintiff's new husband, one other adult and a six-year-old child. These premises were visited by the probation officer and declared to be "in good condition." After his last marriage, defendant had purchased a new, modern home in Contra Costa County where he resides with his present wife. The latter was willing to stop working and personally care for the child as soon as they could afford it.

Plaintiff contends that since his removal to San Francisco the child has had excellent medical care; that his health has greatly improved; and "for the first time in the child's young life, he has been free of the constant and worrisome respiratory infections. . . ."

In refutation of this argument defendant points to one of the medical records in evidence which discloses that on October 17, 1957 (four months after the child's removal to San Francisco), the child had an upper respiratory infection

of 7-10 days' duration. ''The only treatment at that time had been cough medicine and aspirin given by the mother.'' This record also discloses that an examination on said date revealed: (1) ''a history of burning on urination and a spraying type of urinary stream. No medical attention had been given these complaints''; (2) ''a left subacute otitis media'' (inflammation of the ear); (3) ''a moderate nasopharyngitis'' (an inflamed condition of the part of the pharynx situated above the soft palate); and (4) ''bronchitis'' (an inflammation of the bronchial mucus membrane); (5) ''balanitis'' (an inflammation of the glans penis); and (6) ''urethritis.''

Although not included in the medical records, there was testimony to the effect that the child was again in a serious condition ''near pneumonia'' on January 20, 1958. (Both parties testified to this date and the occurrence.) One of the medical records states: ''Mr. Gobar is very anxious to see that the youngster had proper medical attention whenever necessary. If he receives such attention his prognosis is excellent. If not, we would expect progressive pulmonary damage terminating in pulmonary invalidism.''

Most of the record before us deals with the illnesses of the child during the 18-month period between the interlocutory decree and the last hearing, at the conclusion of which the trial court was caused to observe: ''I don't think the argument that the mother should be preferred, all things being equal in this case, should apply at all because she didn't take care of the child when it was given to her, until, as I say, he apparently made motions like he wanted to take it away. . . . I think that during the past years this child has suffered from I think fairly serious physical conditions, which any treatment it has gotten it has gotten from him, any worry about it has been his worry.'' Viewing the record as a whole, we cannot say that this observation was not justified by the evidence, or that the child's physical condition during the nine months preceding the final hearing did not warrant a transfer of custody.

The Civil Code provides that as between parents adversely claiming custody, neither parent is entitled to it as of right, but other things being equal, if the child is of tender years, it should be given to the mother (Civ. Code, § 138, subd. 2). ██ ''But a veritable forest of cases uniformly hold that the paramount consideration is the welfare of the child, and that in making an award of custody the court is to be guided '[b]y what appears to be for the best interest of the child

in respect to its temporal and its mental and moral welfare.' '' (*Noon* v. *Noon*, 84 Cal.App.2d 374, 378, 379 [191 P.2d 35].)

In *Davis* v. *Davis*, 41 Cal.2d 563 [261 P.2d 729], our Supreme Court points out at page 565 that: "The court has broad discretion in matters pertaining to the change of custody of children." In passing upon this question, "It is the welfare of the child and not the shortcomings of the respective parties which is determinative." (*Young* v. *Young*, 117 Cal. App.2d 735, 738 [256 P.2d 1009] ; *Clarke* v. *Clarke*, 35 Cal.2d 259 [217 P.2d 401].)

"It has been held repeatedly that the trial judge having heard the evidence, observed the witnesses, their demeanor, attitude, candor or lack of candor, is best qualified to pass upon and determine the factual issues presented by their testimony. . . ." (*Ducharme* v. *Ducharme*, 152 Cal.App.2d 189, 193 [313 P.2d 33].) "[T]his is especially true where the custody of minor children is involved. An appellate tribunal is not authorized to retry the issue of custody, nor to substitute its judgment for that of the duly constituted arbiter of the facts." (*Currin* v. *Currin*, 125 Cal.App.2d 644, 651 [271 P.2d 61].) It is settled that, " 'An application for a modification of an award of custody is addressed to the sound legal discretion of the trial court, and its discretion will not be disturbed on appeal unless the record presents a clear case of an abuse of that discretion.' '' (*Munson* v. *Munson*, 27 Cal.2d 659, 666 [166 P.2d 268].) "On appeal it is, of course, the duty of this court to view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the successful party in the court below." (*Ducharme* v. *Ducharme*, 152 Cal.App.2d 189, 193 [313 P.2d 33].)

When viewed in the light of the foregoing principles, we are unable to say as a matter of law that the record before us presents a "clear case of an abuse of that discretion."

In her closing brief appellant complains of the restrictive nature of the visitation order which prohibits her from removing the child from the father's home. This order, of course, is not to be literally construed, but to mean only as the court indicated that the child was not "to be shipped back and forth across the bay" indiscriminately, and (as counsel stipulated at oral argument) was not to remain away from the father's home overnight. The matter of visitation is governed by the same principles which govern the question of custody. Here again we cannot say on the record before us that the

court's determination that the child should not remain away from home during the night season was not "for the best interests of the child."

The order is affirmed.

Bray, P. J., and Tobriner, J., concurred.